**CENTRAL DAKOTA RADIOLOGISTS, P.C., Plaintiff,**

v.

**CONTINENTAL CASUALTY COMPANY and Great American Insurance Company, Defendants.**

Civ. No. A1–90–188.

United States District Court, D. North Dakota, Southwestern Division.

April 2, 1991.

Thomas O. Smith, Zuger, Kirmis, Bolinske & Smith, Bismarck, N.D., for plaintiff.

Bradley M. Jones, Minneapolis, Minn., for Continental Cas. Co.

Wickham Corwin, Conmy, Feste, Bossart, Hubbard & Corwin, Ltd., Fargo, N.D., for Great American Ins. Co.

MEMORANDUM AND ORDER

CONMY, Chief Judge.

Plaintiff, Central Dakota Radiologists, P.C. (CDR) commenced a declaratory judgment action against its liability insurers, Continental Casualty Company (CCC), and Great American Insurance Company (GAIC), seeking determination of the respective obligations of defendants with regard to an action filed against CDR and

other defendants by Effideen Ameerally. CDR and GAIC have entered into a settlement agreement settling all claims between those parties as to this litigation.

Before the court now are the remaining parties' cross motions for summary judgment.

## FACTS

CDR is a North Dakota professional corporation which provides medical services. Defendant is a foreign insurance company which has provided insurance coverage to CDR.

Defendant, CCC, insured plaintiff against professional liability by a series of primary and excess professional liability policies (herein referred to as "Malpractice Policy" and "Excess Malpractice Policy" respectively).

Coverage against general liability was provided to CDR by both defendants. CCC provided general liability coverage through two "Commercial Umbrella" policies (herein referred to as "Umbrella Policies").

On October 17, 1989, CDR was named as one of eleven defendants in an action brought by Dr. Effideen Ameerally in United States District Court. Dr. Ameerally's complaint asserted seven counts, three of which involved claims against CDR. Those counts may be summarized as follows:

*Count 3:* Alleged that CDR was liable for unlawful restraint of trade in violation of sections 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. secs. 1, 2. Specifically, Dr. Ameerally alleged that CDR contracted with Sakakawea Medical Center to restrain him from practicing his trade as a radiologist, and the effect of the contract was to monopolize the practice of radiology in the relevant market.

*Count 4:* Alleged tortious interference with Dr. Ameerally's radiology contract with the Sakakawea Medical Center and with his employment contract with St. Alexius Medical Center.

*Count 5:* Alleged intentional infliction of emotional distress, insofar as defendants wrongful acts were intentional and malicious in nature.

After service upon CDR of the *Ameerally* complaint, CDR notified GAIC requesting it assume the defense. GAIC denied coverage for the claims asserted in *Ameerally,* and declined to assume the defense. CDR thereafter notified CCC which assumed the defense under a reservation of rights. After reviewing the *Ameerally* complaint and the policies issued by CCC, CCC determined the claims asserted did not come within the coverages provided, and discontinued the defense.

This declaratory action followed, with CDR asserting it was entitled to coverage under the above mentioned insurance policies, and the defendants had a duty to defend.[1]

### Summary Judgment

Summary judgment is only appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). Summary judgment should not be granted unless the moving party has established the right to a judgment with such clarity as to leave no room for controversy. *Vacca v. Viacom Broadcasting of Missouri, Inc.,* 875 F.2d 1337, 1339 (8th Cir. 1989). The evidence is viewed in the light most favorable to the non-moving party and the non-moving party enjoys the benefit of all reasonable inferences to be drawn from the facts. *Id.* at 1339. The mere existence of some alleged factual dispute, however, will not defeat an otherwise properly supported motion for summary judgment if there is no genuine issue of material fact. *Id.* If the moving party meets its initial burden of production with credible evidence which convincingly shows there is no genuine issue of material facts, the opposing party must come forward with specific facts that demonstrate a genuine issue for trial. *Elbe v. Yankton Indep. School*

---

1. On January 28, 1991, an order of dismissal as to CDR was entered, dismissing with prejudice Ameerally's claims against CDR. Therefore, this inquiry involves only whether the defendants had a duty to defend.

*Dist. No. 1,* 714 F.2d 848, 850 (8th Cir. 1983). A dispute is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

### Analysis

▇▇ The duty to defend an insured is dependent upon the allegations contained in the complaint, and arises when any claim is arguably within the terms of the coverage afforded. *Kyllo v. Northland Chem. Co.,* 209 N.W.2d 629, 634 (N.D.1973). Doubts as to whether the duty exists are resolved in favor of the insured. *Id.* The merits of the underlying claims do not affect an insurer's duty to defend. The claim need only allege facts which fall within a risk covered under the policy. The duty to defend arises even if the claims are determined to be without merit. *Aetna Casualty & Sur. Co. v. Centennial Ins. Co.,* 838 F.2d 346, 350 (9th Cir.1988) (citations omitted). Construction of insurance contracts, to determine if allegations contained in complaints fall within coverage, is a question of law to be resolved by the court. *Cormier v. National Farmers Union Property & Casualty Co.,* 445 N.W.2d 644, 646 (N.D.1989); *Carlson v. Doekson Gross, Inc.,* 372 N.W.2d 902, 904 (N.D.1985).

### Continental Casualty Company's Malpractice/Excess Malpractice Policies

▇▇ The malpractice policy issued to CDR by CCC provides:

### I. COVERAGE AGREEMENTS

The company will pay on behalf of the **insured** all sums which the **insured** shall become legally obligated to pay as **damages** because of injury to which this insurance applies caused by rendering of or failure to render professional services ... (emphasis in original).

Professional services are defined as:

Professional Services means any act or omission:

A. under Individual Professional Liability:

1. in the furnishing of professional medical or dental services by the **insured,** any employee of the insured, or any person acting under the personal direction, control or supervision of the **insured,** or

2. in the service by the **insured** as a member of a formal accreditation, standards review or similar professional board or committee.

B. under Partnership, Association or Corporation Professional Liability, in the furnishing of professional medical or dental services by:

1. any member, partner, officer, director, stockholder or employee of the **insured,** or

2. any person acting under the personal direction, control or supervision of the **insured** (emphasis in original).

Other definitions include:

"**Bodily injury**" means bodily injury, sickness or disease sustained by any person which occurs during the policy period, including death at any time resulting therefrom;

"**Occurrence**" means an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured;

"**Property damage**" means (1) physical injury to or destruction of tangible property which occurs during the policy period, including the loss of use thereof at any time resulting therefrom, or (2) loss of use of tangible property which has not been physically injured or destroyed provided such loss of use is caused by an **occurrence** during the policy period; (emphasis in original).

The parties agree that the excess malpractice policy reflects the same operative terms as the underlying malpractice policy. The parties further agree that coverage under the excess policy is dependent upon a finding of coverage under the malpractice policy.

CCC contends that the wrongful acts alleged in the *Ameerally* complaint resulted from CDR's business activities. No duty to defend arises under the policies, because business activities are not "professional services" as defined by the policy. Coverage exists only for liability claims "caused by rendering of or failing to render professional services," and is limited to medical or dental services.

CDR argues, notwithstanding CCC's definition of professional services, coverage exists under the malpractice policy. Its argument essentially states that coverage provided extends to any injury or damages resulting from any rendering of professional services. CDR provided radiological services to Sakakawea Medical Center, and it stood accused of thereby injuring and damaging Dr. Ameerally. Therefore, the claim was within provided coverage, and a duty to defend arose. CDR contends the harm to Dr. Ameerally was not caused by the business activities which lead to its exclusive contract with Sakakawea Medical Center. But rather, by the fact that CDR provided professional services which Dr. Ameerally had previously provided.

CDR also argues that nothing in the malpractice policy limits coverage to patient treatment. Specifically, it points to language contained in the definitions of medical incident, and professional services. Those definitions indicate coverage exists for "professional service by the insured as a member of a formal accreditation, standards review or similar professional board or committee," and for "any act" of professional services. Moreover, the policy is not limited to acts of malpractice, error or mistake in the furnishing of services. Therefore, the quality of services is irrelevant.

Finally, CDR contends that nothing in the policies excludes coverage for the type of injuries and damages alleged by Dr. Ameerally. It argues that any limitations found in the definitions of "bodily injury," "damages" and "occurrence" are not controlling insofar as the terms are not contained in the insuring clause of the policy.

CDR cites *Jefferson–Pilot Fire v. Boothe, Prichard & Dudley*, 638 F.2d 670 (4th Cir.1980), as support for its position that professional malpractice policies are broadly construed, and include a duty to defend against antitrust allegations. In *Jefferson–Pilot*, a law firm sued its professional malpractice insurer for its failure to defend the firm in a civil antitrust suit. *Id.* at 672. The policy at issue provided coverage:

> [O]n behalf of the insured [for] all sums which the insured shall become obligated to pay by reason of the liability imposed upon him by law for damages resulting from any claim made against the insured arising **out of the performance of professional services** for others in the insured's capacity as a lawyer ... and caused by any act, error or omission of the insured or any other person for whose acts the insured is legally liable (emphasis supplied).

*Id.* at 673–74.

The court concluded that antitrust violations could be construed as 'arising out of' the performance of professional services. *Id.* Therefore, a duty to defend arose.

CCC argues *Jefferson–Pilot* is distinguishable, because the language of the policies involved differs. The policy in *Jefferson–Pilot* provided coverage for claims "arising out of the performance of professional services." The policy issued by CCC provided coverage for "injury ... caused by rendering of or failure to render professional services." While "arising out of" may be construed to include conduct collaterally related to the actual performance of professional services, the more restrictive "caused by" may not.

The court agrees with CCC. Though insurance policies are construed broadly in favor of insureds, a court may not strain language to impose liability on the insurer. *Aid Ins. Servs., Inc. v. Gieger*, 294 N.W.2d 411, 414 (N.D.1980). The language of the malpractice policy is unambiguous. It provides coverage for injury *caused by* the rendering of or failure to render *professional services*. There can be no doubt that CDR provided professional services. However, the injuries claimed made by Dr. Ameerally can not be said to have been

caused by the rendering of those services. Any relation thereto is collateral, and does not trigger coverage under the malpractice policy or the excess malpractice policy. The fact that other claims, in addition to antitrust, were asserted against CDR does not alter this conclusion. The claims do not allege injuries or damages caused by the rendering of professional services.

Therefore, CDR's motion for partial summary judgment as it relates to the malpractice policy and the excess malpractice policy issued by CCC is hereby DENIED. CCC's motion for summary judgment insofar as it relates to the malpractice policy and the excess malpractice policy is hereby GRANTED.

The court does not reach CDR's additional bases for summary judgment as to these policies, and the court makes no findings as to them.

### Continental Casualty Company's Umbrella Policies

The umbrella policies contain two coverage provisions. Provision A provides excess coverage over underlying policies sold to CDR by GAIC. The parties agree provision A is applicable only if there is coverage under the underlying policy, and the limits of that policy are exhausted.

Provision B, however, provides separate coverage:

> With respect to **loss** which is not covered in whole or in part by **underlying insurance,** but which arises out of an **occurrence** covered by this policy, . . . and which **you** may become obligated to pay as damages as a result of liability imposed upon **you** by law or assumed by **you** under a contract because of **Personal Injury, Property Damage, or Advertising Injury** caused by an **occurrence.**
> Personal injury is defined as:
> [A] **loss,** or other than a **loss** arising out of **advertising injury,** arising out of one or more of the following offenses . . .:
>> 1. bodily injury including sickness, disease, disability, shock, or mental anguish, including death resulting from any of these; or

> 2. false arrest, detention or imprisonment, or malicious prosecution, humiliation, wrongful entry or eviction, or other invasion of the right of private occupancy . . . or
> 3. the publication or utterance of a libel or slander or of other defamatory or disparaging material, or a publication or utterance in violation of an individual's right of privacy,

>     .     .     .     .     .

> Property damage is:
> 1. physical injury to or destruction of tangible property including the loss of use thereof at any time resulting therefrom; or
> 2. loss of use of tangible property which has been physically injured or destroyed provided such loss of use is caused by an **occurrence.**

> Advertising injury is:
> 1. The publication or utterance of a libel or slander or of other defamatory or disparaging material, or a publication or utterance in violation of an individual's right of privacy,

>     .     .     .     .     .

> 2. infringement of copyright, title, or slogan;
> 3. unfair competition or idea misappropriation.

> Occurrence is:
> 1. with respect to subsection 1. of the definition of **personal injury** and with respect to property **damage,** an accident, including continuous or repeated exposure to conditions, which results . . . in such **personal injury** or **property damage** neither expected nor intended from the standpoint of the insured. . . .
> 2. with respect to subsections 2., 3., . . . of the definition of **personal injury,** an act or series of acts of the same or similar nature, . . . which causes such **personal injury.**
> 3. with respect to **Advertising Injury,** an act or series of acts in which the same or similar advertising material is used, regardless of the number or kind of media used, . . . which causes such **Advertising Injury.** . . . (emphasis in original).

CCC argues there is no coverage under provision B for the claims asserted. First, the *Ameerally* complaint does not allege an advertising injury. Nor, does it claim property damage of the nature covered by the policy. The policy covers loss of tangible property or loss of use of tangible property, while Ameerally seeks damages for the purchase of equipment, hiring staff, office space, loss of income, loss of skill and emotional distress. CCC further contends that any personal injury alleged by Ameerally is not covered. The policy covers physical injuries to the body, not claims based solely on emotional distress.

Finally, CCC argues the policy is an occurrence policy, and protects only against losses arising out of acts or events constituting occurrences.

CDR does not argue the *Ameerally* complaint alleges personal injury or property damage. It does contend the complaint states a claim included within Provision B's coverage for advertising injury. It notes coverage for injury arising out of unfair competition, and argues Ameerally stated a claim for misappropriation of a business opportunity. CDR also argues the definition of occurrence is not applicable to advertising injury.

CCC's umbrella policies provide coverage for advertising injury caused by an occurrence. Contrary to CDR's position "occurrence" does apply to advertising injury. It is, with respect to such injury, defined as an act or acts using advertising material presented through the media. The court can find no allegation contained in the *Ameerally* complaint which would suggest the use of advertising materials or any manner of media presentation. Therefore, the court finds no duty to defend under Provision B's coverage for advertising injury.

CDR's motion for summary judgment as it relates to CCC's umbrella policies is hereby DENIED. CCC's motion for summary judgment as it relates to its umbrella policies is hereby GRANTED.

*Findings*

Based upon the foregoing, the court makes the following findings:

1. Plaintiff's motion for summary judgment as to its claims against defendant, CCC, is hereby DENIED. (Docket # 17, 22).

2. Defendant, CCC's, motion for summary judgment is hereby GRANTED. (Docket # 13).

IT IS SO ORDERED.