

1995 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

9-15-1995

# Visiting Nurse Assn. v. St. Paul Fire and Marine Ins. Co.

Precedential or Non-Precedential:

Docket 94-2037

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1995

Recommended Citation

"Visiting Nurse Assn. v. St. Paul Fire and Marine Ins. Co." (1995). *1995 Decisions.* Paper 256.
http://digitalcommons.law.villanova.edu/thirdcircuit_1995/256

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1995 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT


No. 94-2037


VISITING NURSE ASSOCIATION OF GREATER PHILADELPHIA

v.

ST. PAUL FIRE AND MARINE INSURANCE COMPANY,
                                                    Appellant


No. 94-2093


VISITING NURSE ASSOCIATION OF GREATER PHILADELPHIA

v.

ST. PAUL FIRE AND MARINE INSURANCE COMPANY

Visiting Nurse Association of Greater Philadelphia ("VNA"),
                                                    Appellant


On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 94-cv-01378)


Argued July 17, 1995

Before:  SLOVITER, Chief Judge, SCIRICA, Circuit Judge,
          and AMBROSE, District Judge[298]

(Filed  September 15, 1995)


Robert R. Reeder (argued)
Joshua Wall
Cozen & O'Connor


1

Philadelphia, PA  19103

        Attorney for Appellant/Cross-Appellee

Jeffrey B. Albert (argued)
Fox, Rothschild, O'Brien & Frankel
Philadelphia, PA  19103

        Attorney for Appellee/Cross-Appellant

OPINION OF THE COURT

SLOVITER, Chief Judge.

        St. Paul Fire and Marine Insurance Company appeals from an order of the district court declaring that it has a duty to defend its insured, Visiting Nurse Association of Greater Philadelphia (VNA), in a case brought against VNA by American Health Systems, Inc. (AHS), a competitor of VNA in the provision of home health care services, under the professional liability coverage it sold to VNA.  VNA cross appeals, preserving its contention that St. Paul's obligation to defend is also based on the comprehensive general liability coverage it purchased from St. Paul.

I.

Facts and Procedural History

        VNA is a non-profit corporation engaged in the business of providing home health care and related services throughout the Delaware Valley.  Agencies such as VNA typically provide home health care to patients who are discharged from hospitals and require follow-up care.  Such agencies receive referrals from hospitals, which are required as a condition of participating in

2

the Medicare and Medicaid programs to transfer or refer their patients to appropriate facilities, agencies, or outpatient services as needed for follow-up or ancillary care. See 42 U.S.C. § 1395x(ee); 42 CFR § 482.43(d). The hospitals employ discharge planners to plan the appropriate transfer or referral of discharged patients.

St. Paul began providing insurance to VNA in 1988. That policy contains coverage for both professional liability and comprehensive general liability. In February 1993 VNA was sued by AHS, another home health agency. AHS's complaint contains claims against VNA under the antitrust laws, RICO and state law. Its antitrust claim count alleges that VNA violated sections 1 and 2 of the Sherman Antitrust Act in that it "conspired with various area hospitals in an attempt to monopolize the home health care market and destroy competition." App. at 45. Essentially it alleges that VNA paid the salaries of the hospitals' discharge planners, who held themselves out as employees of their respective hospitals, and that this caused the hospitals to refer virtually all of their home care patients to VNA. Two counts of AHS's complaint charge that VNA violated provisions of the Racketeer Influenced and Corrupt Organization Act (RICO), 18 U.S.C. §§ 1962(c) and (d), through a pattern of mail and insurance fraud, including disguise of the salaries of discharge planners as allowable costs in its annual cost reports and regular monthly claims. Another count alleges that VNA intentionally interfered with AHS's prospective contractual relations with home care patients.

After receiving the AHS complaint, VNA twice asked St. Paul to defend it in the AHS lawsuit, and St. Paul twice declined. VNA then commenced the present diversity action in the district court, seeking a declaratory judgment that St. Paul was required to defend VNA in the lawsuit brought by AHS and a judgment for all monies expended by VNA and all liabilities incurred but not yet paid by VNA with respect to the defense of the AHS suit. VNA also sought prejudgment interest, punitive damages, and attorneys' fees and costs.

VNA filed a motion for partial summary judgment on the duty to defend issue, and St. Paul moved for summary judgment on all issues. On September 21, 1994, the district court entered an order denying St. Paul's motion for summary judgment and granting partial summary judgment to VNA, declaring that St. Paul has a duty to defend VNA in the AHS lawsuit. The district court held that VNA is not entitled to coverage under the commercial general liability portion of the policy, but that St. Paul has a duty to defend under the professional liability provisions because AHS's claims arise out of the profession named in the policy. The district court denied St. Paul's motion for reconsideration, and St. Paul timely filed a notice of appeal. VNA timely filed a cross-appeal.

After the notices of appeal were filed, the district court, pursuant to agreement of counsel, dismissed VNA's claims for indemnification. We have jurisdiction under 28 U.S.C. §1291. In re Emerson Radio Corp., 52 F.3d 50, 53 (3d Cir. 1995); Cape May Greene, Inc. v. Warren, 698 F.2d 179, 184-85 (3d Cir. 1983).

4

Our review of the district court's grant and denial of the summary judgment motions is plenary.  Pennsylvania Power Co. v. Local Union No. 272, 886 F.2d 46, 48 (3d Cir. 1989).  The parties agree that Pennsylvania law controls the coverage issues. Because the material facts are not in dispute, the only issue before us is the legal question of determining the proper coverage of this insurance contract.  Pacific Indemnity Co. v. Linn, 766 F.2d 754, 760 (3d Cir. 1985).

## II.

### Duty to Defend

The legal principles applicable to this case are well established.  In interpreting an insurance policy, the court must ascertain the intent of the parties as manifested by the language of the policy.  Standard Venetian Blind Co. v. American Empire Ins. Co., 469 A.2d 563, 566 (Pa. 1983).  Where the language of the policy is clear and unambiguous, it must be given its plain and ordinary meaning.  Pennsylvania Mfrs.' Ass'n Ins. Co. v. Aetna Casualty & Surety Ins. Co., 233 A.2d 548, 551 (Pa. 1967).  Where a provision of the policy is ambiguous, it must be construed in favor of the insured.  Standard Venetian, 469 A.2d at 566.  However, a court should read policy provisions to avoid ambiguities and not torture the language to create them.  St. Paul Fire & Marine Ins. Co. v. United States Fire Ins. Co., 655 F.2d 521, 524 (3d Cir. 1981).

The obligation of an insurer to defend an action is fixed solely by the allegations in the underlying complaint.  Humphreys v. Niagara Fire Ins. Co., 590 A.2d 1267, 1271 (Pa.

5

Super. Ct.), appeal denied, 598 A.2d 994 (Pa. 1991). If the factual allegations of the complaint, taken as true, state a claim to which the policy potentially applies, the insurer must defend. D'Auria v. Zurich Ins. Co., 507 A.2d 857, 859 (Pa. Super. Ct. 1986). If the complaint against the insured alleges facts that support a recovery covered by the policy, the insurer must defend the case until it can confine the claim to a recovery that the policy does not cover. Cadwallader v. New Amsterdam Casualty Co., 152 A.2d 484, 488 (Pa. 1959).

St. Paul agreed to defend any suit brought against VNA "for covered claims." App. at 12. VNA contends that two portions of its policy with St. Paul give rise to the duty to defend: the professional liability provisions and the comprehensive general liability provisions. We examine each in turn.

A.

The professional liability coverage provision of the policy "provides protection against professional liability claims which might be brought against [VNA] in [its] professional practice." App. at 12. To be covered, "claims must be based on events that arise out of the profession named in the Coverage Summary," i.e., "home care providers." App. at 11-12. The policy further recites that this coverage protects VNA "against claims that result from professional services that were or should have been provided by anyone for whose acts [VNA was] legally responsible" and that St. Paul would "cover claims that result from the professional service [VNA] performed or should have

6

performed" after the applicable date. App. at 12. Other than the reference to "home care providers," the term "professional services" is not expressly defined in the professional liability portion of the policy.

In seeking to bring itself within this coverage, VNA contends that the services it provides include discharge planning, that discharge planning is a professional service, and that the essence of AHS's claim against it is that the hospitals' discharge planners who were allegedly paid by VNA improperly steered patients to VNA and deprived them of information about and access to AHS's services. Accordingly, VNA argues, St. Paul has a duty to defend because AHS's claim arises out of VNA's professional services and thus potentially falls within the policy's professional liability coverage.

In accepting VNA's position that St. Paul does have a duty to defend VNA under the professional liability portion of the policy, the district court rejected St. Paul's contentions that the AHS claims did not "'aris[e] out of' the profession named in the policy" and that the professional liability protection is limited to claims by clients or patients. App. at 83. Instead, the court concluded that AHS's allegations of "monopolization and conspiracy by VNA in its attempt to destroy its competition in the business or profession of home care provider" are "'events that arise out of the profession named' in that VNA's actions relate to and involve its business or professional activities of providing home care." App. at 83-84. The court found persuasive the opinions of the courts in

7

<u>Jefferson-Pilot Fire & Casualty Co. v. Boothe, Prichard & Dudley</u>, 638 F.2d 670 (4th Cir. 1980), and <u>Jensen v. Snellings</u>, 841 F.2d 600 (5th Cir. 1988), holding the insurer had a duty to defend under the professional liability coverage.

St. Paul argues that the district court erred in concluding that AHS's claims arise out of the profession named in the policy. Its principal argument, however, is that the court failed to give effect to the language of the policy covering only claims that result from the providing or failure to provide professional services. We note that the district court did not analyze the latter requirement, one that is repeated three times in the policy. We believe that coverage under the professional liability portion of the policy can be disposed of by focusing on the meaning of "professional services," and the requirement that the claim sought to be covered must result from providing or failing to provide them.

This court had occasion in <u>Harad v. Aetna Casualty & Surety Co.</u>, 839 F.2d 979 (3d Cir. 1988), to consider how Pennsylvania would interpret the "professional services" language in the context of an insurance contract. Harad, an attorney, represented a client sued by Catania. During the litigation Harad signed a verification to an answer and counterclaim filed on behalf of his client which alleged that Catania conspired or contrived to defraud Harad's client by concealing or misrepresenting certain facts. Catania later sued Harad for malicious prosecution, and The Aetna Casualty and Surety Company, one of his liability insurers, declined to defend. The policy

8

Aetna had written for Harad was a business liability policy that excluded claims "arising out of the rendering or failure to render any professional service." Id. at 983 (emphasis omitted).

This court held that Aetna had no duty to defend, because Harad's action that was the basis of Catania's lawsuit fell into the category of "professional service" and was therefore excluded by the professional liability exclusion. We adopted the generally held view that a "professional service" must be "such as exacts the use or application of special learning or attainments of some kind. . . . A 'professional' act or service is one arising out of a vocation, calling, occupation, or employment involving specialized knowledge, labor, or skill." Id. at 984 (quotation omitted). The relevant consideration is not the title or character of the party performing the act but the act itself. Id. We noted that the acts for which Harad had been sued by Catania, the drafting and signing of pleadings, clearly were "professional in nature and go to the heart of the type of services an attorney provides to his clients." Id. at 984–85.

We noted the distinction between "two very different and often overlooked components" in the practice of law, as well as in other similarly regulated professional activity -- "the professional and the commercial." Id. at 985. The professional aspect "involves the rendering of legal advice to and advocacy on behalf of clients for which the attorney is held to a certain minimum professional and ethical standards." Id. On the other hand, the commercial aspect involves "the setting up and running of a business," including such tasks as securing office space,

hiring staff, paying bills, and collecting on accounts receivable.  Id.

We stated that given the dual nature of the practice of law, a lawyer's liability should be assessed depending on the role the lawyer was playing at the time the potential liability arose.  For example, if a lawyer is sued because a guest in the lawyer's office is injured tripping over the lawyer's briefcase, the lawyer's liability would not derive from the rendering of a professional service but from the operation of a business.  Id.

We concluded that Harad's liability was professional in nature because it derived solely from the provision of legal services, and thus fell within the exclusion from Aetna's Business Owners Policy (Deluxe) for professional services.  Cf. Knorr v. Commercial Casualty Ins. Co., 90 A.2d 387, 388 (Pa. Super. Ct. 1952) (no duty to defend owner of beauty parlor against claim by customer injured when hair dryer fell and struck her head, where policy excluded "injuries arising from the 'rendering of any professional services,'" and term "professional services" referred to "technical work performed by beauticians, hair-dressers, etc.," including drying of hair).

For purposes of this opinion, we accept VNA's contention that discharge planning may involve professional services as that term is understood in the policy.  However, AHS has not based its suit against VNA on any aspect of the application of any specialized skills, knowledge, learning, or attainments by the discharge planners.  Even if the hospitals' discharge planners are treated as VNA's employees, VNA's

10

liability to AHS, if any, derives from AHS's claims that VNA conspired with hospitals to monopolize referrals, engaged in a pattern of racketeering activity, and interfered with AHS's prospective contractual relations with patients. Similar allegations could be made against any business competing for referrals or customers. These allegations stem from VNA's effort to operate its business, not from any professional services that were or should have been provided by the discharge planners, and thus do not even potentially fall within the policy's coverage. Cf. Crum & Forster Managers Corp. v. Resolution Trust Corp., 620 N.E.2d 1073, 1079 (Ill. 1993) (no duty to defend where claims alleging that insureds "committed intentional business torts and engaged in unfair competitive practices" did not "arise or result because of the insureds' performance of real estate services," the service listed in policy's definition of "professional services").

Of course, disposition in each case will depend upon the specific language of the provisions defining the coverage and exclusions of a particular policy. This is illustrated by the decision of a Pennsylvania appellate court which had occasion, in a case brought after Harad, to consider whether a policy covering professional services applied to a suit brought against the insured for wrongful termination. In that case, Biborosch v. Transamerica Ins. Co., 603 A.2d 1050 (Pa. Super. Ct.), appeal denied, 615 A.2d 1310 (Pa. 1992), the insured, Biborosch, was the general insurance agent and manager of a general insurance agency engaged in selling and servicing insurance policies for Penn

11

Mutual Life Insurance Company and Penn Insurance and Annuity Company (collectively, "Penn"). Biborosch's duties as manager included recruiting, training, and supervising agents and brokers.

Biborosch and Penn terminated an agent who then sued them, alleging tortious interference with contractual relations, breach of contract, wrongful discharge, and breach of the duty of good faith and fair dealing. Biborosch was covered by a professional liability policy issued by Transamerica Insurance Company, which provided coverage for "[a]ny act, error or omission of the INSURED . . . in the rendering or failing to render PROFESSIONAL SERVICES . . . in the conduct of the NAMED INSURED'S profession as Life Underwriter, [or] Licensed Life, Accident and Health Insurance General Agent or Manager." Id. at 1052 (emphasis added). The term "professional services" was defined as "those services necessary or incidental in the conduct of the insurance business" of Biborosch, including the sale and servicing of various insurance policies, annuities, and employee benefit plans, and related advice, consultation, and administration. Id.

The court held that Transamerica had a duty to defend Biborosch, because Transamerica "specifically insure[d] Biborosch not only as an insurance broker, but also as a general agent or manager." Id. at 1053. This "crucial aspect" of the policy brought the agent's lawsuit potentially within the coverage of the policy. Id. Biborosch's termination of the agent was an act "committed in the course of rendering professional services as

12

general manager of the agency," thus satisfying the policy's requirement that covered acts "must have been performed in the conduct of the insured's profession as, inter alia, an insurance broker and insurance general agent or manager."  Id.

Relying on Harad, Transamerica argued that the agent's complaint did not fall within the potential coverage of its policy because Biborosch's actions in terminating the agent were related to "running the business" of the agency and were not "professional" in nature.  Transamerica contended that Harad compelled the conclusion that personnel decisions are not professional in nature.  The court stated that while it "might agree with the statements of the Harad court in a case that presented the same issue as was presented there," it did not find Harad apposite to the case before it.  Id. at 1055.  Harad did not involve a policy with "its own expansive definition of 'professional services,' specifically including all acts 'necessary or incidental' to the conduct of the insured's insurance business and administration in connection therewith." Id.  More importantly, Harad did not construe a policy insuring against "liability arising from the performance of the profession of general manager of a business."  Id.  Unlike a policy insuring a lawyer acting as a lawyer, or a doctor acting as a doctor, the Transamerica policy insured Biborosch "when acting as insurance broker and when acting as general manager" and defined general manager of an agency as a covered profession.  Id.

In contrast to the more expansive coverage in Biborosch, St. Paul merely agreed to cover claims "aris[ing] out

13

of the profession named in the Coverage Summary" ("home care providers") and resulting from "professional services that were or should have been provided." App. at 11-12. Inasmuch as St. Paul, unlike Transamerica, did not define "profession" or "professional services" to include conduct "necessary or incidental in the conduct of [VNA's] business," it is not required to defend claims that result from VNA's operation of a business. AHS's claim arises from VNA's competition for clients, a business activity, rather than from its provision of professional services.

The district court relied heavily on Jefferson-Pilot Fire & Casualty Co. v. Boothe, Prichard & Dudley, 638 F.2d 670 (4th Cir. 1980), a case that has some facial similarity in that the issue was coverage under a professional services policy for an antitrust claim against the insured. In that case the insured, Boothe, Prichard & Dudley, a law firm, was sued by a client who claimed the firm had unlawfully conspired with Suburban Savings and Loan Association to require Suburban's borrowers to use Boothe for legal work involved in obtaining real estate loans. The policy required Jefferson-Pilot, Boothe's professional liability insurer, to defend any suit against Boothe raising "any claim made against the insured arising out of the performance of professional services for others in the insured's capacity as a lawyer . . . and caused by any act, error or omission of the insured or any other person for whose acts the insured is legally liable." Id. at 674. Inasmuch as the client's claim was that he and members of the class he

14

represented were "compelled to purchase legal and related services from attorneys not of their choosing at fees greater than those which could be obtained elsewhere and of a quality not best suited to their individual needs," id. at 672 n.2, that court concluded that the antitrust claim arose out of Boothe's "performance of professional services" for the plaintiffs within the meaning of the policy.

In this case, the district court rejected St. Paul's argument distinguishing the Jefferson-Pilot case on the ground that there the claim had been asserted by the client of the insured lawyer. Although the court was correct in noting that St. Paul's policy language is not written in terms of the category of person asserting the claim, in each case the issue is whether the underlying claim is covered by the policy. When the claim is one asserted by the client, i.e., the user of the professional services, it would most likely follow that the claim will be covered by a professional services policy. See, e.g., Jensen v. Snellings, 841 F.2d 600, 613-14 (5th Cir. 1988) (duty to defend attorney against suit by client alleging false tax information and advice). When the claim is one brought by a competitor, it is far less likely to be within that coverage unless, of course, the policy language is broader than that written by St. Paul which limits the covered claims to those that "result from professional services that were or should have been provided." App. at 12 (emphasis added).

Even if we were to assume that AHS's claim "arises out of" VNA's profession, the language on which the district court

focused, it does not result from any professional services, i.e., services that require specialized skill, knowledge, learning, or attainments that VNA provided or failed to provide.  We note that the professional liability policy here, taken as a whole, unambiguously provides that covered claims must both arise out of VNA's profession and result from professional services that were or should have been provided, and therefore conclude that St. Paul does not have a duty to defend VNA under the professional liability provisions.  Cf. Central Dakota Radiologists v. Continental Casualty Co., 769 F. Supp. 323, 326 (D.N.D. 1991) ("While [injury] 'arising out of' [the performance of professional services] may be construed to include conduct collaterally related to the actual performance of professional services, the more restrictive [injury] 'caused by' [the rendering or failure to render professional services] may not.").

B.

VNA cross-appeals, arguing that the district court erred in holding that it was not entitled to coverage under the commercial general liability portion of the policy.  This provides coverage for "amounts any protected person is legally required to pay as damages for covered personal injury that . . . is caused by a personal injury offense."  App. at 21.  Personal injury is defined to mean "injury, other than bodily injury or advertising injury, caused by a personal injury offense."  App. at 22.  Personal injury offense includes, inter alia, "[i]nterfering with the rights provided to a person by a Patients' Bill of Rights or any similar law."  Id.  St. Paul

16

agreed to defend "any claim or suit for covered injury or damage made or brought against any protected person."  App. at 23.

According to VNA, AHS's complaint alleges that VNA deprived patients of the right to be provided the necessary information to make decisions about their health care options. VNA contends that such a right is inherent in all patients' bills of rights, whether mandated by state or federal law or by private associations.  VNA concedes that AHS does not expressly claim that this alleged deprivation is the basis for its lawsuit but argues that the "factual basis" for AHS's complaint demonstrates that such conduct is the "focal point" of AHS's lawsuit.  Brief for VNA at 18.

However, while the AHS complaint contains 104 numbered paragraphs detailing VNA's claims under the Sherman Act, RICO, and state common law, VNA cites only two paragraphs that assertedly touch on patients' rights.  The first states that home care patients are typically 65 years of age or older and are "rarely knowledgeable about the scope of Home Health Agencies and the nature of their services.  The strenuous events preceding the discharge from the hospital add to the confusion of these elderly patients, who become almost totally dependent upon the expertise of the hospital staff for information on home care."  App. at 43 (¶ 29 of AHS Complaint).  The second recites that "the patients lost their freedom to choose among the home health care providers operating in the relevant geographic market since the discharge planners, placed and paid by VNA, held themselves out to be employees of Defendant Hospitals and under such purported

17

'neutral' role steered patients to VNA."  App. at 60 (¶ 95(b) of AHS Complaint).

We believe that the district court succinctly and correctly disposed of VNA's contention.  The court noted that AHS's complaint does not implicate the patients' bill of rights, that such a right belongs to the patient, not to a home care provider, and that no patient alleged any claim in connection with information received or not received about home health care. App. at 79.  We agree.  Thus, we reject VNA's contention that the district court erred in holding that St. Paul has no duty to defend under the commercial general liability portion of the policy.

## III.

### Conclusion

For the foregoing reasons, we will reverse the order of the district court granting partial summary judgment to VNA and remand for entry of an order granting summary judgment to St. Paul.

---

Honorable Donetta W. Ambrose, United States District Judge for the Western District of Pennsylvania, sitting by designation.

18